## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**MICHAEL M. LUCERO,**

       Plaintiff,

vs.                                                                No. CIV 08-355 WJ/LFG

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       Defendant.

### <u>MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION</u>[1]

    **THIS MATTER** is before the Court on Plaintiff Michael M. Lucero's ("Lucero") Motion to Reverse or Remand for Rehearing, With Supporting Memorandum, filed September 9, 2008. [Doc. 22.][2]  The Commissioner of Social Security issued a final decision denying benefits, finding that Lucero was not disabled and not entitled to Supplemental Security Income ("SSI") benefits. The Commissioner filed a response to Lucero's Motion [Doc. 23], and Lucero filed a reply [Doc. 24].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court recommends that the motion be denied and this matter be dismissed, with prejudice.

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2]Lucero's attorney notes that on February 22, 2008, Lucero filed a new application for SSI benefits that does not affect the present action. [Doc. 22, p. 2 n1.]

I.      **PROCEDURAL RECORD**

On February 3, 2005, Lucero applied for SSI, alleging he was disabled from February 1, 2003 [RP 58], due to a large knife wound to his right arm from the elbow to the wrist, suffered in 1994, tendon damage, ulnar artery graph, bruised nerve, depression and anxiety. [RP 67.] Lucero's application was denied at the initial and reconsideration levels. [RP 29, 32, 44, 49.]  On March 5, 2007, the ALJ conducted a hearing, at which Lucero was represented by counsel. [RP 250, 253.] On August 24, 2007, the ALJ issued her decision finding Lucero not disabled. [RP 11, 14-24.] Thereafter, Lucero filed a request for review.  On February 9, 2008, the Appeals Council denied Lucero's request for review and upheld the final decision of the ALJ. [RP 4.]  On April 3, 2008, Lucero filed his Complaint for court review of the ALJ's decision. [Doc. 1.]

Lucero was born on January 20, 1969 [RP 22], and was 38 years old at the time of the ALJ hearing. [RP 254.] He graduated from high school and, in 2002, obtained an Associate's Degree in computer network systems management. [RP 256-57.] For about a year, he worked for AOL answering customer calls but allegedly became unable to work because of pain in his right upper extremity or numbness in several fingers of his right hand. [RP 68.]

II.     **STANDARDS FOR DETERMINING DISABILITY**

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[6] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[8]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[9] age, education and past work experience, he is capable of performing other work.[10]

At step five, the ALJ can find that the claimant met his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy.

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

[9]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[11]

In this case, the ALJ utilized testimony from a vocational expert and made her determination of non-disability at step five of the analysis. [RP 23.]

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d

---

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

at 1497-98.  In <u>Clifton v. Chater</u>, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

<u>Clifton v. Chater</u>, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After carefully considering the evidence, the ALJ issued a thorough opinion denying Lucero's request for benefits. [RP 14-24.]  The ALJ determined, in part, that Lucero had not been engaged in substantial gainful activity since February 3, 2005; had been diagnosed with severe impairments, including chronic right ulnar neuropathy resulting from a stab wound to the right arm and cubital tunnel syndrome on the right; failed to demonstrate his alleged depression and anxiety were severe impairments; none of Lucero's impairments or combination of impairments met listing criteria; was able to perform a limited range of light work, including lifting or carrying 20 pounds occasionally and 10 pounds frequently, standing and walking six hours, sitting without restrictions but was unable to lift, push, pull or grasp forcefully with his right upper extremity more than rarely; was unable to perform any of his past relevant work; was considered a younger individual with more than a high school education; transferability of job skills was not material; and that jobs existed in significant numbers in the national economy that Lucero could perform, in view of his age, education, work experience and RFC. [Tr. 14-24.]

IV.     **MEDICAL AND WORK HISTORY**

Lucero completed high school.  The allegedly disabling injury to Lucero's right arm occurred in 1994, when he was the victim of a stabbing.  At the time of the injury, he was about 25 years old.  He was working then as a retail stocker, plumber and handyman. [RP 257.] He tried to return to that work but was unable to after the injury.  The Department of Vocational Rehabilitation services suggested he go to TVI and obtain an associates' degree which he did in about 2001. [RP 100, 258.]

After Lucero obtained his associates' degree, he was hired by AOL as a customer care consultant in January 2002. [RP 68.]  He worked at AOL for about a year until early 2003, although it appears that he was excused from work a good portion of 2002 and early 2003 due to problems with his right arm or hand.  He obtained short term disability leave and was allowed to work part-time at AOL for some period of time.  He was terminated in about April 2003. [RP 259.]

Lucero has a spotty work history that is not explained.  The only year when he made a "living wage" was in 2002 while with AOL.  [RP 258.]  Since April 2003, Lucero describes himself as self-employed.  He has lived in an apartment behind his parents' house for 12 years or more and at some point began doing yard maintenance work and cleaning for his mother in exchange for room and board. [RP 59, 64, 87]  He works about 30 minutes to an hour a day, four days a week.  His duties consist of taking out the trash, dusting, mopping, vacuuming and cleaning. [RP 87.] He is able to do this work on his own schedule.  He has also described himself as a musician, who plays the guitar and other instruments, and as a financial planner. [RP 68, 287.]

Lucero has never been married and has no children. [RP 58, 254-55.] He receives General Assistance and food stamps.

### *2002 Medical Records*

Lucero's medical records begin on August 9, 2002, when his primary care physician was Dr. John Baca.  At that time, Lucero was employed by AOL for about 8 months.  He saw Dr. Baca complaining of right arm numbness.  He experienced intermittent numbness in his right upper extremity from the shoulder to his hand and mainly in his ring and little fingers.  He was frequently fatigued.  Lucero explained to Dr. Baca that he sustained a stab wound in 1994 to his right forearm and underwent major orthopaedic/plastic surgery at UNM then.  His neuropathic symptoms began after his stabbing.

Dr. Baca observed that Lucero was a depressed appearing male with a subdued affect.  His motor strength was 5/5.  Dr. Baca suspected his problem was largely post-traumatic, related to the stab wound.  He referred Lucero to neurology for an EMG and nerve conduction study.  Dr. Baca also gave Lucero a note excusing him from work for the past several days. [RP 133.]

On August 23, 2002, Dr. Baca saw Lucero again after the EMG was conducted.  [RP 132.] Dr. Baca noted that the EMG demonstrated evidence of minimal elbow region ulnar neuropathy but it did not "seem to indicate much of a problem distally."  Lucero was considering going to work part-time based on this problem. [RP 132.] Dr. Baca's diagnosis was "minor elbow region ulnar neuropathy.  Some of his symptoms in the right hand may be due to carpal tunnel type problems." [RP 132.] Dr. Baca prescribed a right wrist splint to be worn for the next few weeks for 8-12 hours daily.  Lucero should return in four weeks to see it Dr. Baca could assess his work capabilities.

On September 6, 2002, Lucero reported to Dr. Baca that it was very painful to lie on his right side at night.  "He still had not gone back to work at AOL because of the problems he has had with his right upper extremity."  Dr. Baca discussed the possibility of depression and anxiety playing a role, and Lucero admitted they could be a problem.  He tended to get very impatient with customers

on the telephone.  Lucero had never been treated for a mood disorder before.  Lucero was taking Percocet for pain and was prescribed an anti-depressant, Lexapro.  Dr. Baca gave Lucero a note excusing him from work until September 16, 2002. [RP 131.]

On September 13, 2002, Lucero continued to feel somewhat depressed after taking Lexapro one week.  His arm numbness was a little improved.  He was "still off work at AOL because of depression and overall poor mood."  Lucero asked if he might be excused from work for another week to see if Lexapro helped him, and Dr. Baca wrote a note excusing him through September 23, 2002.  He was diagnosed with major depression and anxiety and "right ulnar neuropathy, mild." [RP 130.]

On September 24, 2002, Lucero was seen for anxiety and depression.  He wished to return to work on the following Monday as he felt that the Lexapro was helping him.  He wanted, however, to return to work on a reduced schedule for at least a few months.  He continued to complain of right upper extremity neuropathic symptoms.  Dr. Baca noted that his anxiety and depression were doing much better overall.  Dr. Baca excused him from work for the following week and then Lucero was to return to work part-time. [RP 129.] Based on these records, it appears that Lucero did not work in August or September 2002.

On October 24, 2002, Lucero saw Dr. Baca for cold symptoms.  He wished to have Dr. Baca fill out some insurance paper work for short term disability leave.  He intended to return to work for another month, working four hours a day and four days a week.  His disabling conditions, according to the subjective portion of this medical record, were depression and anxiety which were responding somewhat to Lexapro and Clonazepam, plus a right ulnar neuropathy that made it uncomfortable for him to work a full shift on a computer keyboard.  [RP 128.] Dr. Baca cleared Lucero from work

for the next month through November 24, 2002. It is not clear whether Lucero worked any of October or November or whether he worked a reduced shift. [RP 128.]

There is a form dated 10/24/02 submitted to UNUM showing "Lucero working 4, 4 hour shifts per week" and that he had no restrictions other than lifting and carrying no more than 10 lbs. continuously. [RP 141.] These restrictions were to last through Nov. 24, 2002 and were due to right ulnar neuropathy "proven by EMG" and depression and anxiety that were responding to treatment.

On December 30, 2002, Dr. Baca's medical notes indicate this appointment was an overdue follow-up for depression and right ulnar neuropathy. Lucero missed his last medical appointment because he overslept. He had been oversleeping at work and feeling more depressed over the last few weeks. [RP 127.] He reported he was not always taking Lexapro as prescribed. Lucero had been playing his guitar more lately and working on his home computer, which were causing pain. His ring and little fingers felt more numb. Dr. Baca noted a "very depressed" affect and that his persistent depression was due, in part, to non-compliance. Dr. Baca also wrote that Lucero's right ulnar neuropathy had been judged as "mild" by his earlier EMG that year. Lucero needed to take Lexapro daily. Dr. Baca gave him a note excusing him apparently from work for the next three weeks until he returned for reevaluation. [RP 127.] Again, it does not appear that Lucero worked much between early August through December 2002.

### *2003 Medical Records*

On January 22, 2003, Lucero was seen by Dr. Baca. Lucero had missed a few appointments. On this date he brought in FMLA paperwork that took 20 minutes to fill out. Lucero wished to change job positions to something that would cause less stress. He was particularly troubled by negative customer complaints in his current AOL position. He had more problems with his right arm due to working at a computer keyboard and handling a "mouse." Dr. Baca noted that Lucero

9

had been on Lexapro and Clonazepam although his compliance was questionable.  Lucero assured Dr. Baca that he was taking Lexapro daily.  He also complained of a new problem involving a strained knee that was caused when he jumped out of a slowly moving vehicle. [RP 126.]

Dr. Baca observed Lucero to be a slightly tired looking young male in no acute distress.  His chronic depression and anxiety seemed to be fairly stable.  He was diagnosed again with mild ulnar neuropathy and referred to a specialist about his knee.  Dr. Baca noted that 50% of the appointment was spent filling out paperwork and counseling. [RP 126.]

The accompanying FMLA paperwork, signed January 22, 2003, indicates Lucero had a chronic condition requiring treatment related to right ulnar neuropathy proven by EMG testing and depression. [RP 142.] Dr. Baca did not find that Lucero would have to take leave from work on an intermittent basis as a result of the condition or take leave from work on a reduced schedule.  He noted that Lucero was not presently incapacitated but was uncertain as to the duration of the problem or if additional treatments would be required. [RP 143.] Dr. Baca also wrote that a psychiatrist might be consulted.  Lucero was unable to perform repetitive movements on the keyboard or mouse due to neuropathy.  However, Dr. Baca did not find that Lucero needed to be absent from work for treatment because of these conditions. [RP 143.]

On February 28, 2003, Lucero visited Dr. Baca to obtain a release to return to work.  Thus, it is unclear if he had been working at all since early August 2002.  This medical note states that Lucero would like to return to work part-time for at least several months, but that he was still battling depression and chronic right ulnar neuropathy.  Lucero thought he could work four days a week, but for only four hours a day.  He needed a doctor's note to this effect for Human Resources at AOL.  He continued to take Lexapro and Clonazepam "more faithfully than before." [RP 125.] His diagnoses were chronic right ulnar neuropathy and chronic anxiety and depression.  Dr. Baca

10

filled out the work release allowing Lucero to return to work on March 3, 2003, part-time, as described. [RP 125.]

On March 6, 2003, Lucero returned to Dr. Baca to have the FMLA paperwork filled out regarding his conditions.  This note states that Lucero returned to work effective 3/3/03.  Twenty minutes of the appointment were spent filling out detailed FMLA paperwork stating that Lucero's problems might be present until at least March 3, 2004. [RP 124.]

Based on assertions by Lucero, it appears that AOL did not pay him for working in March 2003 and that he was terminated or released from work in April 2003. [RP. 63, 92.]

After March 6, 2003, there are no additional medical records in 2003, and there are none in 2004, with the exception of an August 2004 appointment related to a spider bite. [RP 210.] It is unknown what medical treatment, if any, Lucero obtained from March 2003 through early February 2005.

### *2005 Medical Records and SSI Application Forms*

On January 19, 2005, there is an application form by Lucero for General Assistance for "disabled adults." [RP 63.]

On February 3, 2005, Lucero applied for SSI, stating he was disabled as of February 1, 2003.

On February 3, 2005, Lucero filled out a disability report stating that the 1994 injury to his arm prevented him from working because of tendon damage, an ulnar artery graph, bruised nerve, depression and anxiety.  He was not able to work long hours or consecutive days because of an arthritis type pain in his right arm, shooting pains in the right arm and his inability to sleep on his right side.  His injury caused him to work fewer hours at AOL in 2002-03 and to receive short term disability.  He was only able to work part-time and could not attend work on numerous occasions because of right arm or hand pain.  At this time, Lucero was taking Ibuprofen for pain [RP 72] and

11

stated he was diagnosed with right ulnar neuropathy confirmed by EMG testing in 2002.  He does not specify that the testing showed only "mild" neuropathy, as confirmed by the records. [RP 66-74.]

Also on February 3, 2005, disability services personnel conducted a face-to-face interview with Lucero. [RP 91.] The notes indicate that Lucero was nicely dressed and that he stated he was fired from one job for having long hair and not cutting it (this apparently was his earlier job in a retail store).  The interviewer did not observe Lucero having any problems moving around, using either arm or hand, or signing the documents.  The earnings records indicated Lucero did not work at least for awhile after being stabbed.  Lucero stated he received financial assistance from a victims' assistance fund. [TR. 91.]

On February 10, 2005, Dr. Richard Ortega saw Lucero.  It appears from the records that Lucero had not been to a doctor regularly since 2003 when he saw Dr. Baca.  Dr. Ortega noted that Lucero was there for an extended visit to restart some treatment plans for chronic pain and right arm post-traumatic ulnar neuropathy that began in 1994.  Dr. Ortega recited his medical history as including reconstructive surgery and physical therapy at UNM and continued care with Dr. Baca. He had been taking Lexapro and Clonazepam.  Because of fatigue and dysphoria that Lucero felt were attributed to the medications, he had become frustrated with Dr. Baca's care and had not been seen by a doctor for awhile.  He felt he was "back to himself" at this time but had problems with erectile dysfunction and periodic depression.  He smoked a pack of cigarettes a day and drank 3-4 beers a day.  He also smoked marijuana from time to time. [RP 206.]

As of February 10, 2005, Lucero reported that he still played as a musician and that fretting with his left hand and strumming with his right hand were "very very therapeutic" for him.  His sleep was disturbed because of discomfort in his right arm.  Lucero told Dr. Ortega that he had kept his AOL job for some time but then felt dysphoric on the medications prescribed by Dr. Baca to the

12

point when he no longer could do the job.  Lucero did not feel he could work more than 10-15 hours a week due to arm problems, fatigue and general low spirits. [RP 206.]

Dr. Ortega noted that he was a pleasant depressed appearing man in no distress.  Lucero had a well-healed right medial forearm surgical scar.  Clinching his fist resulted in some bulging out of the forearm musculature through the fascia but it was "fairly minor."  His radial and ulnar pulses were bilaterally palpable and approximately equal.  He had fallen on his right elbow, and it was bothering him.  There was a tender spot over the olecranon[12] that probably was due to impact trauma from the fall.  His depression was noted as situational and could be related to sleep and an "alcohol problem."  [TR 207.] Dr. Ortega diagnosed Lucero with a tobacco use disorder as well and prescribed Trazodone for his sleep problems.  Dr. Ortega filled out a form related to the disability application indicating that Lucero was temporarily disabled due to an ulnar problem and pain.  He also wrote that because Lucero's situation was not likely to change, he may need to take medications chronically, including pain modulators.  Dr. Ortega advised Lucero to "shoot for a goal" of no recreational substances for a period of time, including cigarette use.  Lucero "seemed open." [RP 207.][13] It appears from this record that Lucero was consuming about 24 beers a week.  Lucero rated his pain as a 6 out of 10. [RP 208.]

A March 4, 2005 x-ray of Lucero's elbow was negative. [RP 145.]

On March 16, 2005, Dr. Jeffrey Sollins performed a consultative examination of Lucero. [RP 150.] Dr. Sollins initially noted Lucero's complaints related to the knife wound, depression and anxiety.  Lucero appeared friendly and pleasant.  He told Dr. Sollins that he had been assaulted and

---

[12]The Olecranon is the proximal bony projection of the ulna at the elbow. Dorland's Illustrated Medical Dictionary (31st ed. 2007), p. 1337.

[13]Based on subsequent medical records, it neither appears that Lucero met that goal nor that Dr. Ortega followed up about it.

had a knife wound from the right elbow to the right wrist that required ulnar artery repair.  He also reported that after the injury, DVR helped him and he ultimately obtained work with AOL.  He went on short term disability because of chronic pain and was told he needed to take FMLA.  Lucero stated he could not return to a 40-hour week because of pain.

Lucero was playing the guitar two hours a day and would like to get back into a band.  He was told by a neurologist that he had neuropathy.[14]  The pain did not start to increase from the original date of the wound and repair until July 2002.

Lucero drank two beers a day. [RP 151.] He was depressed and anxious.  His energy waxed and waned as a result of pain.  On physical exam, Dr. Sollins noted that Lucero was well developed and well nourished in no acute distress.  His personal appearance and ability to relate to others seemed "excellent."  His social activities were normal.  Although Lucero had some trouble lifting heavy items, he was able to get a good grip with his right hand.  If he did not get a good grip, his fingers felt numb and he felt like he might lose the grip. [RP 152.] He did not appear to have any significant deformity although the muscle mass might be a little less on his right forearm.  Still, he had an excellent right hand grip.  There was no inflammation.  The range of motion was good, and no muscle atrophy was observed.  He showed good muscle motor tone and strength.  His ability to stand, walk, stoop, sit were all good.  Lucero was able to grasp, write, pinch, make a fist and perform fine and gross movements based on the one examination.  There were no significant deficits observed by Dr. Sollins. [RP 153.] Lucero's depression was noted and his anxiety as both resulting from the injury.  He was able to play the guitar two hours a day and pick up a bag weighing 20-25 pounds.  He was not sure he could do that repeatedly.  He showed good dexterity with his extremity.

---

[14]"A functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions. . . ."  Dorland's Illustrated Medical Dictionary (31st ed. 2007), p. 1287.

Dr. Sollins noted that Lucero's reported limitations were not compatible with Dr. Sollins' diagnosis and findings on exam. [RP 153.]

Dr. Sollins also filled out a Medical Source Statement regarding Lucero's physical ability to work on that date. [RP 146.] Lucero was limited to lifting 10-20 pounds with the right hand, but there were no other limitations including as to handling objects or fine manipulation with his hands/fingers. [RP 147.] Lucero's shoulders both had the same range of motion. The flexion of his elbows and wrists were the same bilaterally. His hand could be fully extended. Lucero's upper extremity strength was rated as good, and the grip strength in both hands was 5 of 5. [RP 148.]

A day later, on March 17, 2005, Dr. Ortega saw Lucero, who reported he was sleeping better with Trazodone but it made him feel dry-mouthed and like he had a hangover. [RP 203.] He wanted to try some other medication. He also told Dr. Ortega that he was applying for disability benefits and that one of the documents provided by Dr. Ortega needed to be re-done because of the way Dr. Ortega described Lucero's part-time work habits, which apparently were not consistent with what Lucero originally told Dr. Ortega. The medical record indicates Lucero's depression was secondary to the trauma related to his arm neuropathy. Dr. Ortega prescribed Effexor, an anti-depressant and asked Lucero to contact him regarding any beneficial effects. Dr. Ortega was going to re-do the disability form. [RP 203.]

On April 18, 2005, Dr. Tony Kreuch conducted a Psychological Consultative Exam of Lucero. [RP 155.] Lucero arrived promptly and had driven himself to the appointment. He noted that he had applied for disability because of chronic pain. Lucero described the injury in 1994. He was unable to work due to pain and had developed depression and anxiety. Lucero reported he had a history of construction work, retail sales and a job with AOL. He also said he was a musician. [RP 155.]

15

Dr. Kreuch said it was unfortunate that he had no medical records to review with respect to diagnoses by Dr. Ortega of anxiety and depression. However, at this point, Lucero had only seen Dr. Ortega twice in 2005.  Lucero brought a list of his medications including Clonazepam, Trazodone, Viagra and Effexor. [RP 156.] He reported he had never gone for mental health counseling.  His medications were prescribed by a primary care doctor, rather than a specialist.  He also told Dr. Kreuch that he had lived in the apartment behind his parents for almost his entire life, therefore, predating his injury in 1994. He denied drug or alcohol problems.  Lucero had a driver's license and could perform the basic activities of daily life.  He arose at about 10 a.m., drank coffee, "hung around" the house and did yard work.  He had two dogs and played with them frequently. [RP 156.]

On exam, Lucero presented as alert and cooperative.  He was casually but appropriately dressed.  His grooming was adequate and his speech was fluent.  He was verbose and rambling at times.  He avoided eye contact somewhat.  Lucero was not currently taking any pain medications. His mood was anxious, depressed, irritable and his affect was somewhat constricted.  There was no indication of delusions.  Lucero was somewhat disorganized.  His sleep was improved with his current medications.  His appetite was variable.  His judgment and insight were fair.  Lucero related adequately during the interview.  Socially, he appeared somewhat withdrawn.

Dr. Kreuch administered a modification of the formal mental status exam.  Lucero was alert and fully oriented.  There were no prominent problems in his ability to concentrate or pay attention. He performed capably on measures of calculation.  Dr. Kreuch noted that a pain disorder associated with both psychological factors should be ruled out.  He diagnosed him with an anxiety disorder and

stated that a depressive disorder should be ruled out.  He assigned Lucero a GAF of 50[15] and noted that Lucero presented with symptoms and behaviors most consistent with the likelihood of a pain disorder with a combination of medical and psychological features in addition to anxiety and depression.  But, Dr. Kreuch found it difficult to determine without medical records.  Lucero's abilities to understand and remember basic instructions were intact.  His concentration and persistence were fair.  His ability to interact with the public was fair. [RP 157.]

On April 26, 2005, Lucero saw Dr. Baca for follow up care.  Lucero had problems with side effects from Effexor.  He continued to use Trazodone and to occasionally use Clonazepam.  He felt he was improved enough on the current regimen and did not need to try another anti-depressant. The medical record indicates Lucero continued to work part-time as a musician and in an in-kind work exchange with his parents for rent.  Dr. Baca refilled Lucero's prescriptions and at Lucero's request, fitted him with a short arm, medium sized wrist splint so that he could work around the house. [RP 200.] Lucero rated his pain as 5 out of 10. [RP 201.]

On May 9, 2005, a non-examining psychiatrist, Dr. Scott Walker, filled out a Psychiatric Review Technique form. [RP 159.] He found that an RFC assessment was necessary and that there were coexisting nonmental impairment(s) that required a referral to another medical speciality.  He examined Affective Disorders [12.04] and Anxiety-Related Disorders [12.06] but did not find sufficient factors to warrant listing level. [RP 159, 162, 164.] He assigned moderate limitations in difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. [RP 169.] There was insufficient evidence with respect to possible limitations in the area of daily living activities. [RP 269.] Dr. Walker observed that medical notes from Lucero's PCP in 2002

---

[15]"A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." Langley, 373 F.3d at 1123 n. 3 (quotations omitted).

indicated depression and anxiety that responded to antidepressants but that there were compliance issues.  In reviewing the psychiatric evaluation, Dr. Walker noted that Lucero's cognitive abilities were intact although he was socially withdrawn.  He also wrote that Lucero was playing the guitar for two hours a day and performed minimal janitorial work in exchange for his apartment. [RP 171.]

The Mental RFC Assessment, also filled out by the Disabilities Services Physician on May 9, 2005 [RP 173], shows moderate limitations in the abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, and to work in coordination with or proximity to others without being extracted.  It was also determined that Lucero was moderately limited in his ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them, and to respond appropriately to changes in the work setting. [RP 174.] The physician wrote that pain, depression and anxiety may cause some difficulties with Lucero's abilities to sustain concentration, etc.  "It appears that Mr. Lucero is cognitively intact but may require a work setting with sell defined expectations and limited contact with the public." [RP 175.] Lucero's allegations of limitations were partially credible.

On May 10, 2005, Dr. Ed Bocian filled out a physical RFC assessment, finding exertional limitations restricting Lucero from lifting more than 20 pounds occasionally and 10 pounds frequently.  Lucero could stand, walk or sit for six hours.  His ability to push and pull were unlimited.  Dr. Bocian noted the history of Lucero's stabbing and wound in 1994 and that in 2002, he complained of intermittent numbness to the right arm.  The EMG, however, demonstrated minimal elbow region ulnar neuropathy with not much of a problem distally.  Dr. Bocian also observed that Lucero could play the guitar two hours a day and could pick up 20-25 pounds. [RP

18

177, 178.] Lucero is right handed but had good use of the right hand according to the medical examination. There were no limitations for overhead reaching or handling. His depression and anxiety status-post stab wounds may have some minimal impact on Lucero's ability to work. [RP 179.]

On May 10, 2005, Lucero's initial application for SSI was denied. [RP. 32, 49.]

On June 16, 2005, Lucero was seen by an orthopedist at UNMH. Dr. Seelinger noted that Lucero had a well-healed laceration and quite good strength in his right hand that also seemed to have some distal ulnar weakness. Testing results were that all muscles showed normal insertion, voluntary and resting activity except for abductor digiti quinti and the first dorsal interosseous ("between bones") of the hand. There was a mild degree of denervation (resection or removal of nerves to an organ or part). There also had been an abnormal study consistent with a diagnosis of right cubital tunnel[16] syndrome. [RP 226.] The only muscles showing denervation were those supplied by the distal branches of the ulnar nerve. The forearm muscles supplied by the ulnar nerve were normal. "He is having proximal complaints, but the more proximal muscles in arm and forearm did not show diagnostic change." [RP 235.]

On June 27, 2005, Lucero was again seen the Orthopedics Department at UNM. Dr. Eric Benson noted Lucero's complaints of fairly consistent shooting pains and paresthesias in the right upper extremity since his injury in 1994. He was there to evaluate his diagnosis of cubital tunnel

---

[16]Cubital tunnel refers to the opening between the two heads of the flexor carpi ulnaris muscle through which the ulnar nerve enters the forearm. Dorland's Illustrated Medical Dictionary (31st ed. 2007), p. 2018. Cubital tunnel syndrome is "a complex of symptoms resulting from injury or compression of the ulnar nerve at the elbow, with pain and numbness along the ulnar aspect of the hand and forearm, and weakness of the hand." Dorland's Illustrated Medical Dictionary (31st ed. 2007), p. 1852.

syndrome.  Upon exam, he had a positive Tinel's[17] and a positive flexion compression test at the

elbow.  There was no atrophy and his strength was 5/5.  Dr. Benson suggested they try conservative

management for cubital tunnel syndrome with an extension splint that Lucero was to try for six

weeks.  If the splinting did not help, they could plan to do a cubital tunnel release. [RP 232.]

On July 1, 2005, Dr. Ortega again saw Lucero for his chronic right arm neuropathy.  Lucero

noted that he might be a little better with the splinting but he was not sure.  He continued to play

music, with the guitar being his main instrument.  He also played keyboards and various types of

percussion.  He was aware that the right elbow position in playing the guitar might be contributing

to his symptoms.  Dr. Ortega suggested he suspend playing the guitar a bit and focus on other

instruments.  Lucero reported having some internal struggles with the situation.  He previously had

tried several anti-depressants and anti-anxiety agents but was not happy with the side effects.  He

stated that he "would definitely appreciate some regular counseling instead of new medications."

[RP 197.] The medical notes show Lucero was a light smoker and occasional drinker.  Dr. Ortega

tried to reassure him that while his situation was less than ideal, in the total scheme of things, he was

actually doing reasonably well.  Lucero "readily" agreed.  Dr. Ortega made an appointment for

Lucero to see a therapist.  He further advised Lucero that the best plan was to give the non-operative

course of treatment an opportunity to work for his neuropathy so that he had no concerns should re-

constructive surgery not be successful. [RP 197.]

On July 5, 2005, Lucero appealed the denial of his SSI application. [RP 94.] He reported that

his condition has worsened and that he was diagnosed with cubital tunnel syndrome which had

---

[17]Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the sit of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.  Dorland's Illustrated Medical Dictionary (31st ed. 2007), p. 1741.

increased his pain.  He was also prescribed a splint to wear during sleeping hours.  His depression was worse.  He had been referred for mental health counseling.  The pain in his right arm was persistent and he was unable to work. [RP 94.] This form also shows that Lucero had obtained food stamps and general assistance, which he relied on to pay the bills and buy food. [RP 96.] He was taking Clonazepam for pain and depression and Trazodone for sleep. [RP 97.] Because of the constant pain and stress he felt, everything took longer to do and he was getting help.  He was unable to do housework or yard work. [RP 98.] He was using some form of physical therapy daily that he described as applying a moist heat pad for the pain and using therapy putty. [RP 99.] He also rubbed the scar tissue daily to prevent it from attaching to the tendons.  He had to use a hand/wrist splint daily. [RP 99, 100.] Lucero was unable to earn money as a musician because of the condition. [RP 100.]

On August 22, 2005, Lucero was seen at UNMH again for a follow-up appointment regarding the cubital tunnel syndrome and his use of a splint.  On physical exam, he had decreased light touch sensation to the ulnar nerve distribution to the right hand.  He had positive Tinel's sign at the elbow. [RP 192.] The interossei function was 5/5 and was negative for Tinel and Phalen testing.[18]  The x-rays were negative. [RP 224.] Dr. Lieber discussed with Lucero a right ulnar nerve transposition with might help with some, but not all, of the symptoms.  Lucero was to consider the option and return in six weeks to discuss it further.

Dr. Ortega saw Lucero the next day, on August 23, 2005.  Lucero reported that the splint was not helping him.  The Clonazepam was helping his mood behaviors and his depression was better.  He was given samples of Viagra. [RP 191.]

---

[18]Phalen maneuver is used to test for carpal tunnel syndrome.  Dorland's Illustrated Medical Dictionary (31st ed. 2007), p. 1117.

On August 29, 2005, Lucero filled out a Function Report.  He described using a heating pad on his arm in the morning, watching TV, taking Clonazepam, making coffee and going to doctors' appointments.  He showered every 2-3 days and went for fast food and a movie occasionally.  He did physical therapy at home and took care of his pets. [RP 103, 104.] He was not able to perform hard physical labor or repetitive motions.  He could not go to as many outdoor events as he used to attend.  He was able to take care of his daily personal needs but suffered numbness in his right arm and sharp pains. [RP 104.] It took him longer to get dressed, to shave and to cut up meats and vegetables since he is right-handed.  Although he says he used to perform as a musician and play sports, he no longer could do so. [RP 104.] His concentration was not as good and he had to use a 7-day pill box to remind himself which pills to take and when. [RP 105.] He received food stamps and was unable to afford going out much.  He prepared meals for himself one to two times a day, consisting of cereal, sandwiches and frozen dinners.  Friends and family were helping out with some of the cleaning.  Lucero could drive and shop.  He rarely played his guitar now and had not been in a band since 2003.  He might go to an occasional barbeque but did not go out much.  He was having difficulties lifting, reaching, completing tasks and with his concentration or memory.  Constant pain interfered with his concentration and ability to get along with others.  He could walk about a quarter of a mile.  He never used the computer anymore and was constantly broke.  He had not purchased any new clothes or shoes and was afraid his car would die. [RP 103-110.]

On September 7, 2005, Disability Services denied Lucero's request for reconsideration. [RP 29, 220.] Disability Services did not find his allegations severe enough to prevent him from working. [RP 44.]

On October 20, 2005, Dr. Ortega addressed a letter to "whom it may concern." [RP 186.] The letter stated that Lucero was a patient and that Dr. Ortega considered him unable to work due

to physical problems having to do with post traumatic nerve disorder in the right arm.  Lucero suffered from uncomfortable, abnormal sensations (paresthesias) and pain the prevented full time work.  He was consulting with UNM to see if the possibility of further treatment or surgery might give Lucero better long-term relief.  Lucero rated his pain a 7 of 10.  He was given Viagra samples. [RP 186, 187, 240.]

On October 31, 2005, Dr. Moneim, an orthopedist at UNM, saw Lucero.  According to Lucero, Dr. Moneim noted that his ulnar nerve was bruised.  Lucero had been seen in the clinic for several years and also outside UNM since he had paperwork from a 2002 nerve conduction study showing mild slowing of the ulnar nerve velocity behind the medial epicondyle in his elbow.  Dr. Moneim wrote that Lucero was apparently applying for disability benefits.  Lucero reported it was difficult to hold objects or to use a keyboard for long periods of time. [RP 222.] He also suffered from occasional numbness in his ring and little fingers.  Lucero wondered in a new procedure might take care of the problem and the bulging of his muscle on the medial aspect of his forearm.

On physical exam, Dr. Moneim noted a large scar along the ulnar aspect of his right forearm and that when Lucero made a fist, there was a bulging of the flexor pronator group of muscles.  He had a mobile ulnar nerve that could be felt behind the medial epicondyle and when his elbow was flexed or extended, he continued to have numbness in his ring and little fingers.  The hand exam revealed there was filling from the ulnar artery and diminished light touch in the little finger.  There was no wasting of the intrinsic muscles of the right hand and the Froment's sign was negative.  There was minimal clawing of the little finger when the wrist was extended.  Essentially, there was no wasting or weakness in the right hand, by exam.  The last nerve conduction study at elbow, done in June 2005, showed a below normal speed.

Dr. Moneim discussed the results and options with Lucero.  The hand exam showed his hand was quite good with normal strength, as compared to the other hand, and no atrophy or weakness was observed.  Dr. Moneim discussed possible surgery for the ulnar nerve at the elbow which might take care of the numbness and tingling in his hand.  The result of such a procedure, however, was unpredictable as to whether he would be able to work and the effect on his disability application. Basically, there might be some benefit from surgery but no guarantee.  Dr. Moneim noted that they could repeat the nerve conduction study in about 2-3 months.  There was no evidence of any progression of the problem in spite of the fact that there were multiple documentations of some slow conduction across the elbow.  Lucero's hand exam, especially for the intrinsic muscles, is quite normal. [RP 222.]

On November 2, 2005, Lucero filed an appeal, stating that his anxiety had increased due to his pain and that he was given Clonazepam for anxiety. [RP 113, 116.]

### *2006 Medical Records*

There are only a few medical progress reports or forms in early 2006, none of which indicate any additional treatment or new complaints.  On one form, Lucero notes that he is depressed and also that he drinks about 20 beers a week. [RP 238-240.]

### *2007 Records and Administrative Proceedings*

On March 2, 2007, Dr. Ortega filled out a RFC Questionnaire, apparently at the request of Lucero's attorney. [RP 241.] He found that Lucero could sit, stand or walk up to four hour a day but could lift up to 10 pounds frequently and more weight only occasionally because of his right forearm nerve and muscle injury.  Lucero could carry 10-20 pounds frequently and more weight occasionally for the same reason. [RP 242.] He could rarely do simple grasping, pushing, pulling, fine manipulation or gross manipulation with his right hand, although he could perform those tasks with

24

his left hand. [RP 242.] He could never climb or push and pull with his right arm. [RP 243.] Dr. Ortega found Lucero could occasionally crawl, reach overhead, stoop, crouch, knee and grasp with his right hand [RP 243.] He could frequently bend, squat, grasp and pull with his left side.  He should never be exposed to unprotected heights and only occasionally exposed to marked temperature changes all because of his right arm and muscle injury.  The objective signs of pain were joint deformity, muscle spasm and hand malfunction on the right side. [RP 243.] Lucero's pain was moderate and could be tolerated but it would cause "marked handicap" in performance of activity-precipitating pain. [RP 244.]

On March 5, 2007, the ALJ hearing was held.  Lucero was represented y counsel. [RP 250, 253.] He testified that he did his own household chores and laundry although his family sometimes helped him. [RP 255.] He was able to drive every other day and probable drove five times a week. [RP 255.] He had a 1999 Alero that he recently purchased for $1,000. [RP 256.] The ALJ pressed Lucero to describe his work gaps and why he worked one year when he made a "living wage." Lucero did not really explain other than to say he was a victim of a violent attack in 1994. [RP 257.] He also was not terribly clear about whether he asked AOL to work fewer hours or whether his time was reduced by AOL.  At one point, he stated he did not ask for a reduction in hours but that AOL reduced the hours for him because he went to work but did not finish an 8-hour day. [RP 261.] He also stated his hours were reduced at the doctor's suggestion although medical records during this time frame indicate Lucero was requesting notes to excuse him from work and that Lucero planned to work fewer hours. [RP 261.]

Lucero's attorney asked him some questions about his work at AOL which involved a fair amount of work on a keyboard and in handling a mouse.  He claimed to be in constant pain. [RP 274.] He still was doing work for his parents in exchange for rent but he described it as minimal

work. [RP 274, 275.] The ALJ pressed Lucero how he could say his family was helping him with his housework yet he was helping them with theirs in exchange for rent. [RP 276.]

Lucero was currently taking Clonazepam and that helped him with his nerves and to tolerate pain. [RP 278.] The last time he took a prescription painkiller was in 2002 or 2003. [RP 278.] He mostly takes Aleve sparingly. [RP 279.] Lucero still felt depressed at times and did not get out much. [RP 281.] He had seen a psychiatrist in July 2006 at his primary care doctor's recommendation, but there are no corresponding mental health records. [RP 283.] Other than a few sessions with the psychiatrist, either in person or by telephone, Lucero never inquired about getting mental health counseling. [RP 281-84.] He believed his primary problem was not mental but that his physical pain affected him mentally.  Although Lucero had a dog he did not take the dog for walks and did not know why when asked. [RP 284, 285.]

Lucero played his guitar for 20 years and still plays to pass the time but he does not do it as frequently. [RP 287.] The vocational expert was asked a number of hypothetical questions by the ALJ.  When Lucero's attorney attempted to modify the hypothetical by adding a "moderate" limitation in his ability to maintain social functioning [RP 295], the ALJ did not allow that modification, apparently concluding that the term "moderate" should not be used. [RP 295.] The ALJ also did not allow discussion of GAF's because they were beyond the VE's expertise. [PR 297.] The ALJ began to explain why she could not give the primary care physician's opinions too much weight, but stated she would leave the record open for Lucero's attorney to provide additional information from the doctor that might support some of his restrictions. [RP 299.]

On May 1, 2007, there was a letter from Dr. Ortega addressed "to whom it may concern." [RP 9.] The letter sets forth Lucero's history of an assault and that he suffered significant stab wounds, including a complete laceration of the ulnar nerve.  Dr. Ortega stated that Lucero still

suffered with painful right forearm neuropathy which significantly limited his ability to be employed since he is right-handed. It also limited his ability to play guitar music. Lucero had seen multiple specialists at UNM and other specialists privately, and the medical records indicated they felt Lucero was at maximum medical improvement. Lucero would like to be employed more but the painful ulnar neuropathy makes this nearly impossible. Dr. Ortega also wrote that the physical pain understandably had a psychological effect which he diagnosed as post traumatic adjustment reaction that appears to be like depression sometimes and anxiety at other times. Dr. Ortega appeared to find Lucero a credible individual and a compliant patient. [RP 10.]

On August 24, 2007, the ALJ issued her unfavorable disability opinion. [RP 11, 14-24.] She addressed at length why she discounted a number of the physicians' reports and opinions. Ultimately, the ALJ determined that jobs existed within Lucero's RFC that he could perform – file clerk, teacher's aide and cashier. [RP 23.]

On October 9, 2007, Lucero's attorney wrote to the Appeals Council arguing why she believed the ALJ committed error. [RP 245.] On February 9, 2008, the Appeals Council, after considering counsel's letter, denied the request for review. [RP 4.]

## V.   DISCUSSION

Lucero argues that the Court should remand this matter based on at least three errors: (1) the ALJ's RFC determination was contrary to the law and evidence because she failed to include all of Lucero's limitations; (2) the ALJ committed legal error by finding that Lucero could perform semi-skilled jobs without finding he had transferable skills; and (3) the ALJ denied Lucero due process of law by disallowing his attorney to submit a hypothetical question to the VE. [Doc. 22, p. 3.]

More specifically, Lucero argues that the ALJ failed to include depression and anxiety symptoms in the hypothetical. [Doc. 22, p. 5.] Lucero further asserts that the ALJ's finding that his

mental problems did not affect his functioning was contrary to the medical evidence, particularly in view of some of the Disability Services physicians' reports and opinions. [Doc. 22, p. 7.] Lucero also argues that the ALJ erred by failing to include all of his upper extremity impairments in the hypothetical and in discounting the treating doctor's opinions.

In addition, Lucero asserts that the ALJ improperly determined that Lucero could perform semi-skilled jobs when those types of jobs require some sort of interaction with data, people, or objects.  The ALJ did not make a finding that Lucero had those skills and that the skills would transfer to that work.  [Doc. 22, p. 14.]

Finally, Lucero contends that the ALJ denied him due process of law by refusing to allow his attorney to present hypothetical questions to the VE with respect to moderate limitations as found by some of the agency's consulting physicians. [Doc. 22, pp. 17-18.]

The Court addresses Lucero's last two arguments first.  Notably, Lucero did not address either argument in his reply and may have abandoned them.  On the other hand, the government did not respond to the argument concerning transferability of skills in its response.  The Court, therefore, addresses both positions set forth by Lucero.

1.    **Due Process Violation for Failure to Allow Attorney to Present Hypothetical Questions to VE**

Near the end of the ALJ hearing, the VE testified.  First, the ALJ presented a series of hypothetical questions to the VE, to which the VE responded.  Then the ALJ allowed Lucero's attorney to conduct cross-examination of the VE. [RP 290-95.] Lucero's attorney began by asking the VE what would happen to the jobs listed by the VE if the applicant had a moderate impairment in maintaining social functioning. [RP 295.] The ALJ interrupted counsel at that point because she did not believe that it was a proper question to the VE.  "You have to put it in terms in the

28

regulations or that the VE is used to working with that is occasional, constant, repeated, a third of the time whatever.  But, the [term] moderate has a different meaning to each person and I'm specifically seeing AC remands that threw out the question, I'll ask you to rephrase." [RP 295.] While counsel for Lucero argued with the ALJ about her position, counsel eventually was able to re-phrase and proceeded to question the VE. [RP 296-97.]

The ALJ again interrupted Lucero's attorney when she attempted to ask the VE about the GAF of 50 assigned by Dr. Kreuch.  The ALJ stated "not for an vocational expert" because it's beyond her expertise. [RP 297.] In her written decision, the ALJ afforded no weight to Dr. Kreuch's GAF score of 50 because the specifics of Dr. Kreuch's report failed to support that score. [RP 19.]

The Court located a few cases discussing whether an ALJ violated a claimant's due process rights at step five with respect to questioning the VE.  It is true that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Gordon v. Astrue, 249 F. App'x 810, 813 (11th Cir. Oct. 4, 2007) (internal citations and quotations omitted).  In Gordon, the Eleventh Circuit Court of Appeals held that while the ALJ restricted the phrasing of the applicant's hypothetical question on cross-examination of the VE, the applicant's due process rights were not violated because she still had a meaningful opportunity for cross-examination.  Id.

In Chuculate v. Barnhart, 170 F. App'x 583, 587 (10th Cir. Mar. 15, 2006), the plaintiff argued that the ALJ violated his due process rights by denying him permission to submit a post-hearing written question to the VE.  The Tenth Circuit rejected the plaintiff's argument finding that there was no evidence to support the questions he wished to submit.  The Court further noted that the limitations a plaintiff asserts (in a hypothetical to the VE) must be supported by the medical evidence or the ALJ should not include them in a hypothetical question.  Id.  See Evans v. Chater,

55 F.3d 530, 532 (10th Cir. 1995) (hypothetical questions to a VE need only include those limitations the ALJ finds are established by substantial evidence). *See also* Sanabria v. Commissioner of Social Security, 2008 WL 5264669 at *5 (11th Cir. Dec. 18, 2008) (ALJ is not required to pose a hypothetical question assuming limitations that the ALJ does not find credible).

Here, the Court recommends denying this claim because Lucero's attorney ultimately was allowed a meaningful opportunity to cross-examine the VE. [RP 296.] Moreover, the ALJ explained to some extent during the hearing and more fully in her written decision that she either did not find those limitations about which Lucero's attorney attempted to ask the VE credible or substantiated by the objective medical evidence.  Therefore, under Chuculate and Sanabria, the ALJ was not required to pose a hypothetical question based on limitations not found credible.

The Court finds that the ALJ did not err and recommends denying the claim that Lucero's due process rights were violated.

### 2.    Transferability of Skills

Lucero argues that the ALJ found he could work because he was able to perform three jobs, two of which (file clerk and teacher's aide) are semi-skilled and require some sort of interaction with data, people, or objects and also require some judgment. [Doc. 22, p. 14.] Lucero further asserts that if the ALJ finds he is able to perform semi-skilled work, she must also make a finding that he has the requisite skills and that the skills will transfer to that work.  In support, Lucero cites Social Security Ruling 82-41.

Lucero observes that the ALJ made no such findings in this case and did not ask the VE any questions about transferability of skills.  In addition, in her written decision, the VE found "Transferability of job skills is not material to the determination of disability." [RP 23.] The Commissioner did not respond to this argument in her opposition brief.

Here, Lucero graduated from high school and attained a two-year associate's degree in computer network systems management.  He had worked for AOL as a customer care consultant for approximately one year and in that position, had used a computer daily.  He was a "younger person" for purposes of determining disability.

The ALJ was not required to expressly state that because Lucero is a younger individual and has more than a high school education, transferability of skills is not material as the Medical-Vocational Guidelines ("grids") support a not disabled finding, regardless of whether he has transferable job skills.  *See* Maddaloni v. Astrue, 2008 WL 2906094 at *5 (D.N.J. July 28, 2008) (upholding ALJ's findings of non-disability because he was a younger individual, had a high school education and transferability of skills was not material because the grids supported a finding of not disabled).  *See also* Sickman v. Secretary of Health & Human Services, 828 F.2d 20 (Table, Text in Westlaw), 1987 WL 44643 at *3 (6th Cir. 1987) (because disability applicant was a younger individual, age thirty-seven, and had a high school education, the issue of skill transferability was not material).

The ALJ discussed Lucero's age, education and determined that Rule 202.21 of the grids supported a finding that there were jobs in the national economy in significant numbers that Lucero could perform. [RP 23.] *See* Rule 202.21 of Table 2, Appendix 2 to Subpart P, 20 C .F.R. § 404 (202.21 shows skills not transferable under column of previous work experience for high school graduate or more).  *See* Surace v. Sullivan, 1989 WL 65169 at *4, (N. D. Ill. June 13, 1989) (ALJ quite properly applied Grid Rule 202.21: Surace was a "younger individual" . . ., she had a high school education and her previous work experience fell within the "skilled or semiskilled-skills not transferable" category).

At the ALJ hearing, the VE testified that Lucero's prior work would be considered skilled work. [RP 291.] Thus, even if it were error for the ALJ not to make specific findings about whether Lucero had transferable skills to do semi-skilled work, the omission was harmless error. There is sufficient evidence in the record to show that Lucero could perform skilled work. Thus, there is little question that he could perform positions that required less skill. Moreover, it appears that SSR 82-41 is more pertinent to cases where the applicants are of advanced age and can do less than medium work. *See* Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir.1993) (claimant both of advanced age and limited to sedentary work).

Therefore, to any extent, if at all, that the ALJ erred in not making findings about transferrable skills, the Court recommends that the error be found harmless and that the claim concerning transferability of skills be denied.

### 3.   RFC Determination and ALJ's Failure to Include all Limitations

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuous basis – that is, eight hours a day for five days a week, or an equivalent work schedule. "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. " S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is not the least an individual can do despite his limitations or restrictions, but the most. 20 C.F..R. § 404.1545 (2006).

The ALJ is entrusted with the determination of a claimant's RFC and such determination must be based on all of the evidence in the record. 20 C.F.R. § 404.1546; Corber v. Massanari, 2001 WL 1203004 at *5 (10th Cir. Oct. 11, 2001). The ALJ must evaluate a claimant's physical and mental RFC, must determine the physical and mental demands of the claimant's past relevant work

and finally determine if the claimant has the ability to meet the job demands despite any physical or mental limitations.  Doyal, 331 F.3d at 760.

Social Security Ruling ("SSR") 96-8p defines "RFC" as "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  1996 WL 374184 at *2 (July 2, 1996).  When a claimant has a severe impairment not meeting the listings, the ALJ must consider the limiting effects of all of the claimant's impairments, even those that are not severe, in determining the RFC.  20 C.F.R. §1545(e) (2006).

SSR 96-8p requires that the ALJ's RFC assessment be based on all of the relevant evidence in the case, including medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, medical source statements, and the effects of symptoms, including pain, that are reasonably attributed to the claimant's medically determinable impairments.

Further, the RFC assessment must consider and address medical opinions from treating sources.  "Controlling weight" must be given to a treating physician's opinion about the nature and severity of a claimant's impairments if "it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record."  20 C.F.R. § 404.1527(d)(2); Doyal, 331 F.3d at 762.  An ALJ, however, may disregard a treating physician's opinion if it is not so supported.  Id. (citing Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994)).

33

a.    *Failure to Include Depression & Anxiety*

At step four, the ALJ determined that Lucero was able to perform a limited range of light work.  He was able to lift or carry 20 pounds occasionally and 10 pounds frequently.  He could stand and walk six hours out of an eight-hour work day and could sit without restrictions.  He could only rarely lift, push, pull, or grasp forcefully with his right upper extremity. [RP 20.] In determining Lucero's RFC, the ALJ first determined that Lucero's depression and anxiety were non-severe impairments that had no more than a minimal effect on his ability to work.  In other words, the ALJ was "persuaded the claimant is able to perform all basic work-related mental functions." [RP 16.]

Lucero contends that he had significant nonexertional functional limitations that were well-documented by objective medical evidence and improperly disregarded or discounted by the ALJ.  The ALJ fully addressed the doctors' reports and more than adequately explained why she discounted or disregarded certain opinions.

In 2002, there were medical records for six visits Lucero made to Dr. Baca.  Lucero primarily presented for problems with his right arm, but Dr. Baca, while not a mental health care specialist, noted that he appeared depressed.  Dr. Baca suspected the depression was largely "post traumatic," related to the earlier stab wound in 1994. [RP 133.] On one of these occasions, Dr. Baca stated Lucero exhibited a "slightly depressed affect perhaps" and prescribed an anti-depressant. [RP 131.] Lucero continued to appear depressed after taking the anti-depressant one week. [RP 130.] However, after several weeks of taking the medication, Lucero reported he felt better, stabilized and "mellow." [RP 129.] Dr. Baca noted that his anxiety and depression were much better overall.  Several months later, Lucero stated he was not taking the anti-depressant all of the time, and he exhibited a "very depressed affect" at this appointment.  Dr. Baca noted that his persistent depression was due, in part, to non-compliance. [RP 127.]

34

Interestingly, several years later, Lucero complained to his new doctor, Dr. Ortega, that the anti-depressants prescribed in 2002-03 by Dr. Baca were not helpful and that side effects of fatigue and dysphoria may have affected his ability to do his job. [RP 206.] Such complaints were not documented by Dr. Baca during 2002-03.  Rather, when Lucero reported to Dr. Baca that he took his medications regularly, his mood was reported as having improved or stabilized.

The ALJ took all of this into account in her thorough written decision.  She noted the diagnosis of depression by Dr. Baca and the medical treatment.  She aptly observed that while Dr. Baca listed major depression and anxiety as diagnoses, he failed to list any specific signs or symptoms to support those conclusions. [RP 16.] The ALJ also noted that Dr. Baca had found Lucero's mental condition improved in 2002, and that in 2003, after Lucero reported to Dr. Baca that he took his medications "more faithfully than ever before," his depression and anxiety were "fairly stable" and that the medications had helped. [RP 17, 124, 126.]

In finding that Lucero's mental condition was not severely limiting, the ALJ also relied on Dr. Jeffrey Sollins' report.  She acknowledged that Dr. Sollins was a specialist in internal medicine and not a psychiatrist. [RP 17, 18.] However, Dr. Sollins conducted a thorough examination of Lucero in 2005, at which time Lucero appeared pleasant and friendly.  He was playing his guitar daily and wanted to get into a band.  Dr. Sollins observed that Lucero's ability to relate to others was "excellent" and his social activities were "normal."  While Dr. Sollins noted depression and anxiety, he concluded they were "because he had had this injury." [RP 17, 153.] Nothing in Dr. Sollin's thorough report noted a concern that Lucero should see a mental care specialist or that his mental conditions appeared severe and debilitating in any way.

The ALJ also reviewed, at length, the consulting psychiatrist's report.  Dr. Kreuch examined Lucero one month after Dr. Sollins saw him. [RP 155.] Lucero argues that Dr. Kreuch's report

strongly supports severe mental limitations.  But, as noted by the ALJ, Dr. Kreuch's report is internally inconsistent. [RP 17.] Dr. Kreuch documented Lucero's subjective reports of depression and anxiety and that Lucero was taking an anti-depressant then, along with an anti-anxiety agent. Dr. Kreuch observed that Lucero had never seen a mental health specialist.  He denied drinking or having a drug problem to Dr. Kreuch but admitted to Dr. Sollins just a month earlier that he drank two beers a day.  Indeed, just two months earlier, Lucero told Dr. Ortega that he drank 3-4 beers a day and smoked "pot" from time to time.  Dr. Ortega thought his depression might be situational and related to sleep or an "alcohol problem." [RP 206-07.]

Dr. Kreuch observed that on mental examination, Lucero appeared alert and cooperative. He was casual but appropriately dressed.  His grooming was adequate, and his speech was fluent. He was verbose and rambling at times.  He was not taking any pain medications.  His mood was described as anxious, depressed and irritable.  His judgment and insight were fair and he related adequately during the interview.  Socially, he appeared somewhat withdrawn.  Dr. Kreuch administered a formal mental status exam which showed Lucero was alert and fully oriented. Lucero had no problems concentrating or paying attention.  He performed "capably" on measures of calculation.  His abilities to understand and remember basic instructions were intact.  His ability to interact with the public was fair.  Dr. Kreuch wished to rule out pain disorder and depressive disorder.  He diagnosed Lucero with an anxiety disorder.  Without any explanation, Dr. Kreuch assigned a moderately low GAF score of 50.

The ALJ accepted the substance of Dr. Kreuch's report which appeared consistent with other medical evidence, yet she found that the GAF of 50 was inconsistent both with his own report and the weight of the evidence.  Dr. Kreuch also failed to list any signs, symptoms, or clinical findings (despite testing) to suggest Lucero was limited in mental functioning.  To the contrary, Dr. Kreuch's

report leads one to believe, with the exception of the GAF score, that Lucero was functioning adequately or normally in many aspects.

Lucero complains that the ALJ impermissibly picked and chose from Dr. Kreuch's report. The Court rejects this position. The ALJ fully and convincingly explained why she accepted the substance of Dr. Kreuch's report, but disregarded the inconsistent GAF score. [RP 17, 18.]

Lucero also argues that Dr. Kreuch was not given Lucero's medical records to review at the time of his examination and that this was contrary to the Commissioner's own regulations and internal operating systems. The Court rejects this position as well. At the April 2005 exam by Dr. Kreuch, Lucero had only seen his primary physician on two occasions in 2005. One of those appointments was devoted almost entirely to filling out disability forms (or asking Dr. Ortega to re-do an earlier form that Lucero found unhelpful in his application process). [RP 203.] The other record would have informed Dr. Kreuch more fully of Lucero's possible alcohol problem and marijuana use, and Dr. Ortega's view that his depression might be related to alcohol use. Dr. Ortega, on that occasion, asked Lucero "to shoot for a goal of no recreational substances," including his use of nicotine. With the exception of these two treating physician records, there were no other recent medical records to present to Dr. Kreuch in April 2005. Before February 2005, Lucero had not seen a doctor for several years either for pain management or depression. Thus, to the extent there was any error for failing to provide Dr. Kreuch with medical records, the Court finds the error was harmless.

Lucero also relies heavily on the disability services' consulting psychiatrist's report. Dr. Walker did not examine Lucero but reviewed the medical records in May 2005. [RP 159.] Dr. Walker found Lucero to have moderate limitations in 8 subcategories: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance

37

and be punctual; work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately in the work setting. [RP 173-75.] Dr. Jill Blacharsh reviewed and approved the evidence and these restrictions. [RP 175.]

The ALJ acknowledged Dr. Walker's restrictions but found his conclusions contradicted by the reports of Dr. Sollins and Dr. Kreuch. [RP 17-18.] The ALJ further explained that she afforded Dr. Walker's opinion less weight than Dr. Sollins or Dr. Kreuch, who both examined Lucero.  In addition, Dr. Sollins' statements were more consistent with Lucero's activities of daily living as reported at the hearing and in the record as a whole. [Tr. 18.]

The Court finds that substantial evidence supports these conclusions by the ALJ.  Nothing in the record evidences all of the moderate restrictions found by Dr. Walker.  Instead, the reports of daily activities, both as recorded in medical records and self-reported by Lucero in disability filings, indicate that in early 2005, he was playing the guitar daily for two hours, he found fretting and strumming with his hands to be "very very therapeutic," he was working part-time as a musician [RP 200], his medications were effective enough for him to elect not to try another anti-depressant [RP 200], his mental status exams were essentially normal [RP 155], he worked part-time for his parents in doing yard work and housework to pay for his rent [RP 150], and he felt closer to "back to himself."  [RP 206.]

In addition, there was objective medical evidence documenting Lucero's most recent treating physician's referral for mental health counseling in July 2005. [RP 197.] Lucero reportedly told Dr.

Ortega that he would "definitely appreciate some regular counseling instead of new medications."
Notwithstanding Lucero's assertion, there are no medical records indicating Lucero ever obtained
psychological counseling, and only unsubstantiated references by Lucero that he saw a psychiatrist
on one occasion and spoke by telephone to the doctor on several other occasions.  Dr. Ortega also
determined in August 2005, that the anti-anxiety medication was helping Lucero's behaviors and
that his depression was better. [RP 191.]

The ALJ appropriately noted that Lucero never raised a problem of depression or anxiety to
a health care professional. [RP 18.] Based on substantial evidence in the record, the ALJ found that
Lucero was only mildly restricted in his ability to maintain social relationships, was capable of
responding appropriately to supervisors, co-workers and the general public, had never experienced
an episode of mental decompensation and was highly unlikely to decompensate if placed in a work
setting.  The ALJ also found no restrictions or only mild restrictions in the areas of workplace
decisions, attendance, schedules, completion of tasks, and interactions with supervisors and peers.

The Court concludes that the ALJ provided specific, legitimate and well-supported reasons
explaining why she did not give certain medical opinions controlling weight.  The Court further
determines that substantial evidence supported her decision in finding that Lucero's depression and
anxiety were non-severe and that his mental conditions would have no more than a minimal effect
on his ability to work.  Thus, there was substantial evidence to support the ALJ's RFC's findings.

### b.  *Failure to Include All of the Upper Extremity Impairments*

Lucero also argues, based primarily on medical reports or evaluations from Lucero's PCP,
Dr. Ortega, that the ALJ erred by failing to include all of his upper extremity impairments in the
RFC determination. [Doc. 22, p. 11.] Dr. Ortega wrote several letters (in October 2005 and in May
2007) addressed "to whom it may concern."   Generally, Dr. Ortega opined in his letters that

39

Lucero's physical discomfort from the arm injury and repaired ulnar nerve prevented full-time work, or that the painful ulnar neuropathy made additional employment "nearly impossible." [RP 9, 186.]

On March 2, 2007, Dr. Ortega filled out an RFC Questionnaire supplied by Lucero's attorney. [RP 241.] In the Questionnaire, Dr. Ortega limited Lucero's ability to sit, stand, walk or work to four hours. He could lift up to 10 pounds frequently and more pounds only occasionally because of his right forearm nerve and muscle injury. He was able to carry 10-20 pounds frequently. Lucero could rarely do simple grasping, pushing, pulling, fine manipulation, or gross manipulation with his right hand, although he could perform those activities with his left hand. [RP 242.] Dr. Ortega limited Lucero to never climbing, never pulling or pushing with his right arm, and occasional crawling, reaching above, stooping, crouching, kneeling and grasping with his right hand. [RP 243.] He was able to frequently bend, squat, grasp, and pull with his lift side. [RP 243.] Lucero was restricted from exposure to unprotected heights and only allowed occasional exposure to marked temperature changes. Dr. Ortega supported these restrictions based on the right arm and muscle injury. [RP 241-44.] Lucero claims that the ALJ erred by discounting or disregarding Dr. Ortega's restrictions and failed to provide the required analysis as to the weight assigned to Dr. Ortega's opinions.

"The ALJ is required to give controlling weight to the opinion of a treating physician as long as the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." Hamlin, 365 F.3d at 1215; see also Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *2. But if either of these requirements is not met, the ALJ is not required to give the opinion controlling weight; in fact, it may be an error to do so. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL

374188, at *2).  Instead, the ALJ must decide whether to reject the opinion altogether or assign it some lesser weight. <u>Watkins</u>, 350 F.3d at 1300-01.

It is also noteworthy that the "'treating physician rule governs the weight to be accorded the medical opinion of the physician who treated the claimant . . . relative to other medical evidence before the fact-finder, including the opinions of other physicians.'" <u>Reid v. Chater</u>, 71 F.3d 372, 274 (10th Cir. 1995) (internal citation omitted).  An ALJ properly rejects a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with other evidence of record. The general rule is that an ALJ "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." <u>McGoffin v. Barnhart</u>, 288 F.3d 1248, 1252 (10th Cir.2002) (quotation and italics omitted).

The ALJ must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5.  Furthermore, the ALJ must discuss the uncontroverted evidence she did not rely upon in her decision and any significantly probative evidence that she rejects. *See* <u>Frantz v. Astrue</u>, 509 F.3d 1299, 1303 (10th Cir.2007).

Here, the ALJ once again engaged in a comprehensive discussion of the medical record and opinions of the treating physicians, along with the specialists who saw Lucero.  The ALJ observed that in 2002, Dr. Baca released Lucero to work on a part-time basis (four hours a day, four days a week).[19]  The ALJ further noted that Dr. Baca did not limit Lucero in terms of sitting, walking or

---

[19]Although not noted by the ALJ, the Court observes that the idea to return to work on a schedule of four hours per day and 4 days per week appeared to be Lucero's. [RP 128, 129.] ("would like to return to work on a reduced schedule for at least a few months until he gets everything in order").

standing and provided no indication that any limitations Lucero had in 2002 were permanent or life-long. [RP. 20, 142.] Indeed, the form which Dr. Baca filled out in late 2002 stated the restrictions were to last for a two-month period. [RP 141.] The FMLA leave form, filled out by Dr. Baca in early 2003, stated that Lucero was not presently incapacitated.

The record evidence supports the ALJ's understanding that any limitations Lucero had in 2002-03 were thought to be temporary, even though his condition, "right ulnar neuropathy," was described as "lifetime" by Dr. Baca. [RP 142.]

In addition, Dr. Ortega's later opinions that Lucero probably could not work, based on his limitations, is not dispositive since final responsibility for determining the ultimate issue of disability is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e); Castellano, 26 F.3d at 1029.

The ALJ also addressed Dr. Ortega's examinations of Lucero.  For example, Dr. Ortega noted minor bulging in Lucero's right upper extremity.  He observed that despite Lucero's complaints of pain, he continued to play the guitar regularly and other instruments, including the keyboard and various types of percussion. [RP. 20.]

The ALJ concluded that Dr. Ortega's statement that Lucero's right hand or right upper extremity problems preclude him from working a 40-hour week was not supported anywhere in the record and was inconsistent with the balance of the record, including Dr. Sollins' clinical findings. [RP 21.] The ALJ expressly stated that she afforded greater weight to Dr. Sollins' assessment of Lucero's RFC than to Dr. Ortega's, having found that Dr. Sollins' findings were recited specifically as opposed to Dr. Ortega's restrictions which were stated vaguely and generally. [RP 21.] For example, under every category of limitation marked by Dr. Ortega (even exposure to unprotected heights and to marked temperatures and to dust, fumes and gases), Dr. Ortega wrote "right arm

nerve + muscle injury." [RP 242-43.] Dr. Ortega further marked "joint deformity" and "muscle spasm" as objective signs of pain and wrote in "hand malfunction on right." [RP 243.]

No medical records indicate, on exam, findings of "joint deformity" and "muscle spasm" or even "hand malfunction."  This form, filled out by Dr. Ortega, is the only record indicating these problems.

The ALJ observed first, that nothing in Dr. Ortega's notes negated the conclusion that if Lucero were not required to use his right hand or arm on a repeated basis, he would be unable to work a full five-day or 40-hour workweek.  She further evaluated the remaining objective medical evidence, including the 2005 EMG testing that showed "quite good strength in the hand" and other radiological studies that showed no abnormality in the right elbow. [RP 20.] The ALJ included a review of an orthopedic physician's examination in June 2005 where he found 5/5 strength in both of Lucero's upper extremities. [RP 20, 232.] That specialist, as noted by the ALJ, found decreased light touch sensation in the ulnar nerve distribution to Lucero's fingertips but no atrophy. [RP 20.]

In addition, when Dr. Sollins examined Lucero in March 2005, he observed no significant deformities and imposed no work restrictions.  He described Lucero's muscle mass in the right forearm as "slightly diminished," but that his grip was excellent and he had good range of motion throughout his shoulders, elbows, wrists and spine with no muscle atrophy.  His strength, reflexes and sensation were intact.  Dr. Sollins found no limitations in Lucero's ability to stand, walk or sit.

The ALJ also relied on the orthopedist, Dr. Moneim's medical notes from October 2005, after he examined Lucero.[20]  Dr. Moneim noted the nerve conduction studies done in 2002 that showed a "mild" ulnar nerve velocity. [RP 222.] Dr. Moneim noted Lucero's complaints of

---

[20]It appears that the ALJ mistakenly referred to this record as being from August 2005. [RP 21.]

numbness, tenderness and bulging of his muscle on the medial aspect of the forearm.  However, on exam, he found that the Allen's test showed there was filling from the ulnar artery.  There was no wasting or weakness in the right hand.  The hand was "quite good" in normal strength compared to the other hand.  Dr. Moneim observed no atrophy or weakness.  He further stated that the hand examination, especially for intrinsic muscles, is "quite normal." [RP 21, 222.] Noting in the specialists' various medical reports leads one to conclude that Lucero was physically incapable of working nor did any specialist make such a finding.  Instead, as noted by the ALJ, Lucero continued to be treated very conservatively for his condition.  [RP 22.]

The ALJ proceeded to more fully address Dr. Ortega's March 2007 limitations. [RP 21.] She afforded only limited evidentiary weight to that opinion based on a lack of objective support for the extreme limitations imposed and contradictions in the record as to the limitations Dr. Ortega checked off.  Not only were the limitations contradicted by the medical reports, as discussed, they were contradicted by Lucero's self-described activities and capabilities.  For example, he played the guitar and other instruments regularly, all of which required the use of both hands.  The instruments required fine manipulation of his fingers and hands.  He was able to shave, cook and drive regularly.  When asked at the ALJ hearing, why he could not walk far, he had no explanation.  Yet, Dr. Ortega limited his ability to walk in many areas, without adequate explanation.

The ALJ also observed that during the hearing, Lucero exhibited no discomfort or restricted range of motion.  Instead, he actively used and gestured with both arms and hands equally. [RP 21.] This is consistent with what the interviewer for disability services stated in February 2005. [RP 91.]

The Court concludes that the ALJ did follow the analysis required in evaluating a treating doctor's opinion and that she fully described the reasons she disregarded the restrictions imposed by Dr. Ortega, as well as some of his opinions.  She expressly stated she gave Dr. Ortega's opinions

44

limited evidentiary weight based on a lack of objective medical evidence to support it, contradictory medical evidence in the record, consisting of specialists' exams and reports, testing, Lucero's description of his activities and lifestyle, and the ALJ's observations of Lucero at the hearing. Thus, the ALJ committed no error, and the Court recommends finding that substantial evidence supports the ALJ's determination as to the treating physician's opinions regarding alleged physical limitations.

### c.   *Failure to Include Complete Right Hand and Arm Restrictions in Hypothetical to VE*

Lucero argues that the ALJ did not include the complete right hand and arm restriction in the question to the VE, which renders her reliance on the VE's testimony contrary to law. Lucero asserts that because the hypothetical to the VE did not accurately reflect all of his impairments, the VE's testimony does not constitute substantial evidence supporting the non-disability finding.

It is true that the VE's hypotheticals to the VE became narrower. She began by asking the VE to assume, *inter alia*, that Lucero could perform fine and gross manipulation only rarely with the right dominant hand. [RP 292.] In the second revised hypothetical, the ALJ asked the VE to assume Lucero was unable to grasp forcefully with the right hand, unable to perform fine manipulation more than occasionally, and unable to push or pull with the right hand. [RP 293.] The VE could only come up with two positions based on the first two hypotheticals.

The ALJ then asked the VE what in the hypothetical was eroding the job base, and the VE answered that it was the restriction in doing fine manipulation more than occasionally with the dominant hand. [RP 294.] The ALJ then posed a third hypothetical to the VE that included the limitation of being unable to grasp forcefully with the dominant hand on a repeated basis and inability to push or pull with the right upper extremity, more than occasionally. [RP 294.] This

hypothetical removed any limitations as to fine or gross manipulation, which Lucero argues was error. The result of the hypothetical was the VE's testimony that, based on those limitations, Lucero could perform the positions of file clerk, teacher aid or cashier. [RP 294.]

The Court concludes that the ALJ's formulation to the VE was supported by substantial evidence which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." In other words, there was "more than a scintilla, but less than a preponderance." The ALJ specifically recognized Lucero's right upper extremity limitations, and determined there was substantial evidence in the record to support a determination that he could still manipulate small objects.

The only objective medical evidence that limited Lucero's ability to perform fine or gross manipulation with his right hand was Dr. Ortega's March 2007 RFC Assessment. [RP 241.] The Court already discussed why the ALJ's decision to assign limited evidentiary support to that assessment was appropriate and supported by substantial evidence. The Court further notes that Dr. Ortega's 2007 assessment was not linked to any recent physical exam of Lucero. From the record, it does not appear that Lucero saw Ortega in early 2007 or that he saw him for any significant complaints in 2006.

Moreover, Dr. Ortega's summary RFC assessment states without any convincing or supporting explanation that Lucero cannot be exposed to marked temperature changes or to unprotected heights. Dr. Ortega opined that Lucero could never climb or push and pull with his right arm. All of his limitations were explained by the same phrase: "right forearm nerve and muscle injury." The limitations, including those related to fine and gross manipulation, simply are not supported by substantial evidence.

This is particularly true in view of a number of different orthopedic specialists' examinations of Lucero in 2005, none of which referred to such limitations.  In June 2005, Dr. Seelinger found that there was a mild degree of denervation and that testing showed all muscles had normal insertion except for the abductor digiti quinti and the first dorsal inerosseous of the right hand.  No limitations were noted. [RP 234.] Later in June, Dr. Benson observed no atrophy and 5 of 5 strength of the "intrinsics."  In July 2005, Dr. Ortega's records indicate that Lucero continued to play music, including the guitar, keyboards and percussion instruments. [RP 197.] In August 2005, Dr. Lieber, noted 5 of 5 interossei function and negative Tinel and Phalen tests.  No significant abnormalities were found in the x-rays. [RP 192, 224.] In October 2005, Dr. Moneim stated that Lucero had occasional numbness in his ring and little fingers.  There was no wasting of the intrinsic muscles of the right hand.  Froment's sign was negative.  There was minimal clawing of the little finger.  The hand exam showed his right hand was quite good "with normal strength" compared to his other hand and no motor atrophy or weakness. [RP 222.]

Dr. Ortega's summary assessment is contradicted by the specialists' consistent examinations and findings, along with Lucero's daily activities and the observations of Lucero by disability services and the ALJ during the hearing.  In addition, it is contradicted by assessments performed by Dr. Bocian [RP 177] and by Dr. Sollins [RP 150.]

The Court concludes that the VE's hypothetical question posed to the VE reflected all of Lucero's relevant and substantiated impairments and that it properly omitted non-severe impairments or impairments that lacked credibility or substantial evidentiary support.

## VI.    <u>RECOMMENDATION</u>

For all of the above-stated reasons, the Court recommends that Lucero's Motion to Reverse or Remand be DENIED and that this matter be DISMISSED, with prejudice.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge